You may proceed. Thank you, Your Honor. May it please the Court, I'm Celia McGinnis, representing Plaintiff and Appellant C.L., who is present in the courtroom. I'd like to reserve three minutes of time for rebuttal. To begin with the question of mootness that was raised by the Court on Monday, this case is not moot. There is no evidence to raise any Article III concerns. The NTC program is a curriculum that is followed by employees of Del Amo Hospital. It is not a separate entity. Del Amo Hospital still has a locked psychiatric ward providing containment and security and stabilization to return to the community. C.L. will still go there when she needs to prevent from killing herself, and Del Amo Hospital will still refuse to allow her psychiatric service dog, Aspen. Let me ask you a few questions about this. As I understand what happened procedurally, when the case got to trial and you waived damages and the trial was before Judge Carter sitting as a court, all the evidence was presented. That is, he held a trial on whether the dog needed to be certified, and then he heard evidence on the merits, correct? The question of whether Aspen was a service dog was part of the full trial, yes. When he decided the case, though, he decided it, he said, needs to be certified, the dog needs to be certified and enter judgment in favor of the hospital, correct? That's right, and then it was the first case. So then the record, the trial record was set, right? Yes. And at that time, the program that was the focus of this trial was still in place, is that correct? The curriculum. I don't have any knowledge that it was or was not. Well, the trial record, they talk about it in the trial record. I see. I'm sorry, I thought you meant at the time of the second judgment. No, I'm talking about the time of the trial. Yes. Okay. So then it comes up to us, we reverse send it back down, and Judge Carter doesn't conduct any further proceedings, is that correct? Other than supplemental briefs and an argument. Yes. No further evidence was presented. Correct. Why was that? I believe he thought the record was complete. He needed to decide whether CL was a service dog under the direction of this court, and he did. And then he needed to decide whether the affirmative defense had been approved, and Del Amo did not raise a mootness question at that time. Well, if Del Amo, at the time of the second judgment, if I'm not mistaken, the district judge, Judge Carter said, or he was advised, that the curriculum was no longer in place, as you just phrased it. Is that correct? That is correct. That is in the record. But Del Amo did not ask for a mootness finding, and he did not mention that. But I'm not even talking about mootness, I'm just talking about whether or not the record needed to be further developed. He did not think so. Del Amo did not ask. And the plaintiff didn't ask? No, he did not. Okay. Is there anything in the record that sheds any light on what the, what they are currently doing, or what the current curriculum is, and how that is similar to or different from the curriculum that was the focus of the trial? Not specifically, Your Honor. The record does show that the, that the witnesses were all Del Amo employees, and that it was a curriculum. And I mean, I can tell you that from looking at their website, the current executive director of the hospital is one of Seal's treaters who is in the record, Dr. Wong. But after that, I don't know if I can answer the Court's question. And so the relief that you are seeking, and that, if we were to remand, I guess that you would get is an injunction saying that they have to allow, that they have to allow Seal to bring Aspen into whatever the program is that they have now, right? When she voluntarily, yes. Right. But it just seems very, I mean, we have, we have evidence in the record about whether, whether the presence of a dog, you know, would fundamentally alter the old program. We don't really know anything about whether it would fundamentally alter the new program. If I may, Your Honor, the statute says whether it would fundamentally alter the services provided. And the services provided are containment, safety, and stabilization to return to the community. The particular details of the curriculum, the schedule, and that kind of thing aren't the essential nature of the services provided. And this, and there's no evidence before this Court that the essential nature has changed in any way, shape, or form. Del Almo Hospital is still a locked psychiatric ward, and its goals are to contain so people don't commit suicide, and to stabilize them sufficient to allow them to return to the community. And that was the goals that the Court found. I mean, in, in, in finding seven, it found these were, that's the purpose. In finding 51, it found specific goals for Seal, and the goals did not say to, to learn this particular NTC curriculum. And so, the, the particular details of that curriculum are not what is essential to this case. What is essential to this case is, she has a psychiatric service dog, it is a reasonable accommodation, and Del Almo has not shown that bringing the service dog will, will cause a fundamental alteration in the services that it provides. So what do we do with, I mean, so Del Almo had, you know, they had some experts, you had an expert, and their expert said, you know, the, the point of the program, you know, paraphrasing here, is to teach people, you know, essentially techniques of self-reliance, right, so that they can sort of understand their own, you know, emotional states and deal with them on their own, and, and the presence of some, you know, external factor like a dog to help them deal with that would, would interfere with the process of, would interfere with that process. And you had experts who said, you know, that's not really true, that's not how it works, but why, we're reviewing the district court's factual findings for clear error, why, why was it clear error for the district court to decide that their experts were right about, you know, what the goal of the program was and, and how a dog would affect that? Well, to put a pin in the question of whether clear error is the correct standard, and to support their opinions, the Dalamo witnesses, they admitted baldly on, under cross-examination that they were speculating about what the impact would be if CL brought her service dog. Well, but they're, I mean, they're medical experts, right, and maybe at a certain point, you know, if they're just, at a certain point, if it becomes too speculative, that's the basis for a Daubert objection or a basis for the district court to decide, like, you know, I don't, I don't believe their conclusions because they're not adequately supported, but it's a really clear error when a, when a, you know, their doctor is making predictive judgments about, you know, what will or will not be, be appropriate medical treatment. How is it erroneous for the court to accept that? We all want to believe our doctors are acting with good medical judgment, but doctors have an obligation to act not just with ideas, but with medical evidence and objective evidence, and these doctors did not act as we would want our doctors to do. They did not consult any medical journals or look at any peer-reviewed studies. They did not consult with their peers. They did not consult with her, with her treater. They did not have any information about how a psychiatric service dog works, nor did they search for it. Some of them Googled, and that is not how a doctor should approach a new situation. Let me ask you a question along these same lines. As I understand what the district court said was that the presence of, was it Aspen? Yes. That he would have an effect on how she, on the services provided to her, that it would affect her, wasn't so much that it would fundamentally change the way in which they provided the services. Am I splitting that too fine, or is? No, you've nailed it, Your Honor. That's exactly right, and that's why this is a de novo review, because the court did not follow PGA Tour versus Martin to determine what the impact would be upon the services provided. It only determined what, how CL might react, and it did not say, I'm totally out of time, it did not say, it did not say how the services would change. The services will not change. They testified. They will not do anything different, and the court made no findings that the services would be provided in any different way. No impact upon any patients. No impact upon the services. Very different from Lentini when there was a... So counsel, if it's okay for me, I know we're running a little long, but I think we're kind of getting to the heart of my concern in this case, which it seems to me this case is different than all the other cases. Obviously, Pete, the Martin case, but every other case, because this is the only case I saw in all the cases cited where the doctors are actually, are trying to treat the very disabling condition, right, the thing that causes a disability. That's what the medical professionals are trying to treat, and they're saying, in order for us to treat it, we need, you know, we can't have these extraneous factors in order for us to treat the way we're trying to treat, and that's different than every other case. You know, other cases, I think if we saw that had a service dog, may involve the hospital, but it was concerned about the dog, you know, causing disruption or something like that. It wasn't concerned with the dog actually interfering with the treatment they're trying to provide, and it doesn't seem to me like, you know, if somebody says, I need my walker, and you say, yeah, I know, but I'm trying to help you to walk better, and we can't have you use your walker. I understand the walker does a lot of good for you, but we need you to not use the walker while I'm trying to help you with the treatment. That's what sounds like is going on here, something kind of like that's at least their me second-guess the doctors on that, right? That like, you know, if you replace the dog with a walker or cane or a back brace or any other thing that is a good thing normally, but, you know, we're used to doctors saying we've got to put those things aside when we're actually doing the treatment. So why is this case not different in that respect, and why should we not defer to the doctor's judgment on that? If I may answer thoroughly, two issues, factual and legal. Factually, Your Honor, with respect, the judge did not find that they could not treat. The judge found that she might not receive their treatment. No, I know, but that's my point. Like, you know, you could treat somebody who had a cane, you know, and you're trying to help them to walk better, but you say, when we treat you, we need you to put the cane aside so we can treat you, and then you can have the cane back, and the reason you say, well, why, you know, the cane helps me a lot, I should, you know, it's the same exact argument you're making about the dog here. You say, yeah, the dog helps a lot, but we want to put the dog aside while we're treating you, because if you have the cane while we're treating you, our treatment won't be as effective because you'll be relying on the cane instead of the treatment. It's the same argument. It's the same situation. The court found that Del Amo, or that Aspen performs eight tasks for CL. Only one of them is grounding, is related to the therapy. Del Amo did not say, bring your dog in, but as the expert Katie Gonzalez said, leave him in your room during the therapy sessions. That would have been something Del Amo could have said. Del Amo focused on, and the court, focused on the one task, the grounding, to the exclusion of the other seven tasks, like waking from nightmares, like preventing self-harm, and the record is replete with instances where CL suffered because she did not have her service dog. She was headbanging, and she didn't get interrupted. She had terrible nightmares, and there was no one to interrupt them, and so she suffered while they focused on one small piece of what she did that was, if I may, not essential to the nature of the program, because their job is to... You want us to... I guess that's... You're really getting to know of it, because these doctors are saying it is, and you want us to say it isn't. And I understand that we have to do that in the ADA context, but this is the only case I've ever seen where it's actually the doctors who are treating the disability, because in other circumstances, when somebody says, we don't want your service dog here, you're kind of a suspect that they don't want the service dog here because they have, you know, they have... They're worried somebody gets rabies or something like that, right? But here, the doctors are trying to help her with the very thing that causes the disability, and so when they say, we can't help you as well when you have your dog with you, I mean, it's really... For us to put ourself in the place of the doctors? Well, it was their second defense. It wasn't what they told her at the time, but setting that aside. This court does make an objective decision. That's what PGA TOUR instructs, and that's what this court did in Lentini, and Bragdon v. Abbott also says that this court has the ability to look at the judgment of a medical professional and determine, what is it based in? Is it just my opinion, or does it have science behind it? And in this case, there's no science behind it. Thank you, counsel. We've taken you over your time, but we'll give you two minutes for rebuttal. Oh, thank you. And we will hear from Mr. Burkett. The amicus is first. Oh, sorry. Trying to cut in line. Good morning, Your Honors, and may it please the court. My name is Logan Burkett, and I'm here on behalf of AMICI, Mental Health America, and others in support of Appellant CL. A lot of the questioning so far has touched on some of the points I wanted to emphasize. In particular, we often rely on the judgment of medical professionals. It's a reasonable thing to do. However, in Bragg v. Abbott, the court clearly instructed that medical professionals are entitled to no special deference just because they are medical professionals. Those are the express words of the court. Here, Del Amo did not perform an individualized assessment of aspen as is required by PGA TOUR. They didn't ask about the tasks. They didn't meet aspen before making these decisions. They simply rejected it wholesale. Like a cane or a wheelchair, psychiatric service dogs are a protected assistive device. Like any other accommodation, those rights do have practical limits, but they are based on objective scientific evidence. They are reasonable. In the context of hospitals, DOJ guidance states that areas with general infection control measures, like burn units or operating rooms, have no obligation to allow service dogs entry. But in all other areas where no additional concerns are raised, no additional precautionary measures are undertaken, where personnel, patients, and staff can all access freely, service dogs must be allowed to accompany their owners. Congress— Let me ask you. You began by saying the medical professionals don't get special deference. Do you think that's what the district court did? Do you think it erroneously gave special deference to the doctors here? I think there's no other way to look at it in light of the record. Each of the experts and the medical director expressly stated that they had no knowledge of service dogs and no understanding of the research, and if they had, they would have seen a body of research and studies establishing the significant benefits of service dogs. Of course, just like there would be a body of research saying the significant benefits of wheelchairs and canes. And yet, when you go in to get your physical therapy, they may say, can you please put your cane in the corner? We're going to— No, no, I need my cane. So all the citations in the briefing about how beneficial service dogs are, I'm having trouble seeing how that's relevant to the particular question here, which is, yes, but obviously the service dog is super helpful, but what about when you're trying to actually treat the underlying concern, and you have somebody that says what medical professionals do all the time in our regular life, which is, please put away the things that you normally used to treat this. Please don't take that medicine right now. Please don't, you know, and so that's the big—it's not so much a deference to the doctors as, excuse me, you rely, not just you, but your side of the case relies on two things, which is, one is the fact that, like, the service dog is super helpful. And obviously the service dog is super helpful, just like a cane is, but that doesn't really help us with the question of, is the service dog super helpful when you're trying to treat the malady? So that's the—and then, and so I don't know, I'm just really struggling with, we're not—you wouldn't have to be an expert in canes, for instance, to be able to say, but the way we help treat people is without having an assistive device when we're treating them. So you wouldn't have to be an expert in canes, you'd have to be an expert in the how to treat people without having assistive devices, and then you'd be enough of an expert, wouldn't you? If I may? Please. The research does state that it would help with the treatment to a certain extent. We're not necessarily—that would be an entirely new actual undertaking, and so it's not for this court to necessarily decide on that. But to use your analogy, it's not as if we're asking the patient to leave their cane in the corner during their physical therapy session. It's telling the patient that you can't come to physical therapy and go to the room next door and stay in your room for unprogrammed time with your cane. Well, yeah, because, I mean, the analogy breaks down because the cane is probably a physical thing, and these are mental health issues. So it seems to me like you would usually say, we'll give you back the cane when the physical therapy is done, but treating a mental health issue—I mean, I'm not an expert on this stuff, which is part of the problem, but treating that would be—may be helpful to say, let's put aside the assistive device that you use for some period of time, you know, if you're here for three days, for those three days. I think anybody suffering from mental health issues will tell you they can be as impairment and as all-encompassing. Let me ask you just a question, as I understand this. So she was there 24 hours a day, is that correct? That's correct. It's an inpatient program. Right. And was she in treatment the whole time, just by being housed in the facility? It's not that she was in treatment in the respect that anybody was—at DeLama was doing anything for all of that time, but she was within a facility that provided the service of stabilization. She was there not to kill herself. Counsel said that unequivocally. So that's a service she's receiving around the clock, but otherwise, no. So her, quote-unquote, treatment, learning how to—self-grounding and whatnot, how was that provided? Like one-on-one or group therapy? Both. There's a mixed program of group therapy, one-on-one, to my knowledge of the record, which is admittedly not the same as counsel. But all of these techniques and the actual programming at DeLamo Hospital has a component that asks them to figure out what works for them. In this case, they decided, you can come to our program to learn what works for you, but you're not allowed to bring what you've already found works. Well, how about when she's sitting one—let's say she's in group therapy, or with the doctor, as Judge Van Dyke has been suggesting. Couldn't they say, look, we think you—ask him how to stay in his room? They could have absolutely made that modification. And they chose not to entertain it in the slightest. There's—very little was being asked of DeLamo Hospital. The case law establishes that somebody needed to care for Aspen, that they weren't being asked to change the product and services that they provide. Let me ask you something. If we agreed with you and we ruled in your favor, and there was some program that says, while you're here, we don't want you to call family, just the way—that's kind of our policy. We don't want you—I think in this program, they did let people—but they said, we don't want you to call family, because we think that's how—it's a good way to treat—we want you to—we want to be able to focus on some other things. Family's good, but we want—wouldn't that—wouldn't they basically—that would be subject to—under the analysis we would be providing here, somebody could say, no, you need to be able to—need to do an individualized analysis of whether I need to be able to call my family, and if I want to call my family, I need to be able to call my family. Calling your family isn't an expressly stated, protected right within the context of treatment, but even still, asking that doctors conform their rules and policies to evidence-based—evidence-based support and citations is not asking too much. Asking them to conduct an individualized assessment of their patients' needs is what doctors do. So just to be clear then, your position is that the evidence is just overwhelming, and it's clear that there would never be a good reason to not have a service dog and have the service dog excluded in order to treat somebody for mental health issues? No, I don't believe so. I believe our position is that some compromise could have been—some research could be done that demonstrates that there's one of the aspects that might interfere or potentially distract. You know, on page 31, I think of the—they talk about the fact that—she testified that in her—I think in her deposition, he says, what are the aspects of the program that assisted you with the goal of not killing yourself? And one of them was saying, well, being locked in a room and being able to basically go deep into memories and not be worried about the fact that I could kill myself, because they're basically preventing her from—but if the dog's in there with her, and this would be outside of the treatment time, this would be in the—you know, the dog might be actually keeping her from being able to do that. I mean, wouldn't it be possible that the doctors think that? The record demonstrated absolutely no attempt to cite sources that say that exposure therapy is necessary, and even still, there was nothing stopping them from creating those circumstances with some allowance for access to her service animal. They didn't engage in that level of accommodation process, and that's not what the case law, the statutes, and the regulations insisted of them. Thank you, Mr. Burkett. And Mr. Martinez, now we'll hear from you. My name is Raul Martinez for Apelles. Let me address the mootness issue first. The NTC program has closed. They had an insufficient number of patients to continue the program, so in the circumstances of this case, you couldn't grant any effective relief that would overcome the mootness problem. I believe that's the standard. You know, can this court grant effective relief? If the program is closed, and the court were to reverse and she would be allowed back in with her dog, what would happen? The program wouldn't be there for her to be allowed in. But, I mean, you heard the argument this morning is that this particular curriculum may no longer be there, but the hospital is still in operation, and she's still seeking admission. Right. About the hospital, this NTC program had its own protocol for managing the program, admitting patients. The other units of the hospital have different administrators, different personnel, and the NTC program is unique, very unique. Plaintiff was asked by the judge, why did she go to this program? And she said, because the only other program was in, I believe, Texas or Oklahoma. So it's very, very specialized. The record is very clear it's specialized. And the record is very clear that this case involved only the NTC program. And when did the program close? I believe it started closing in 2020. And why, three years later, I mean, like, there was a footnote in your brief that mentioned that the program has closed, but we didn't get any briefing on mootness. I'm afraid nobody picked up on it, and I think the court has a valid point that I think the case is moot. But we didn't raise it. They didn't raise it. Go ahead, I'm sorry. I mean, I guess maybe it is, but it's kind of hard for us to say that when we haven't really been given any record on how the current operations of the hospital are not similar to the NTC. I mean, so if you close the National Treatment Center, but we're still operating something that was basically the same, but just with a different name, I don't think anyone would think that was moot. No, but there's nothing in the record showing that she tried to get into this other program. There's nothing in the record saying she went to the psych ward or the psych unit to be admitted under that procedure. Well, the entire case is about NTC. When she alleged in her complaint that Del Almo had unlawfully excluded Aspen from inpatient mental health treatment, the complaint did not focus on this particular program. Right, but then you had a pretrial conference, and then you had a trial, and it wasn't tried. The pretrial conference order supersedes the complaint. What was in the pretrial conference order? Well, at that point of the pretrial conference, she waived all damages, and she decided to proceed only under injunctive relief. Yes. She put on her case as to the NTC program only. So that is the focus of the case. You can't go back and say— Well, my initial questions of counsel were that maybe the district court judge was just too quick. When it went back down on the remand, when it went back to Judge Carter, it was the fact of this particular program no longer being in existence was made aware, and he knew it. I don't know that he knew it. It's in his—I think it's in his order, isn't it? Right, but I don't think he put it all together. He knew that this changed the outcome of the case. I think he may have been— Well, it may not have changed the outcome of the case, but it may have required the further expound on the record of what was going on at the hospital with respect to these kinds of services. Well, at some point, it's up to the plaintiff to put on a case, and this case was presented based on the evidence that existed when the NTC program was available. When it went back on remand after the reversal, if the plaintiff wanted to introduce new evidence— Well, if you'd been on your toes, you would have raised the whole problem, and the court could have dealt with it. It could have, but again, jurisdictional defects are never waived, and frankly, we didn't pick up on it, my co-counsel and I. There's a footnote in there, but it didn't register with any of the parties. Assuming you're right that it's moot, why doesn't it fall within the voluntary cessation exception to mootness? The point of the voluntary cessation exception is we are suspicious of defendants who get sued, and then after a couple of years of litigation, they just say, well, okay, now we're not doing the thing anymore, and then they just go and start doing something very similar to it the next day. Why isn't this kind of like that? The voluntary cessation defeats mootness. I think voluntary cessation affects the remedy of dismissal and vacatur. I think that's where voluntary cessation comes in, if I am correct on the law on that, Your Honor, so that you don't defeat mootness by saying we voluntarily ceased the program. The program was ceased because they didn't have enough patience. Let me ask you this. Does Del Amo no longer provide this kind of treatment at all? My understanding is that they don't. No, not this particular program. They don't provide inpatient mental health treatment. They do, and they have a psychiatric unit, but each unit, like the NTC program, is run by different people with different criteria on who gets admitted. And let's assume that she went back and tried to get admitted into the psych ward, she'd have to make a record of that. This case would be moot, and if she wants to go back and get readmitted to that unit, she can, and make a record for that. You don't have that in front of you. Did the district court actually sign a pre-trial conference order? I don't know. It's in the record. Tell me where in the record I can find this. I don't have the exact page number. When I was looking through the record, I saw that there was a pre-trial conference order included in there, and it was agreed to by the parties. I did not, frankly, see the judge's signature on it, because the pre-trial conference order was not in the excerpts of record. Some judges, when you're getting ready to go to trial, they will actually do a pre-trial conference order. Others sometimes don't. They just say, well, let's do it. I don't know if the court signed it. This is what we're going to try. Judge Carter runs a pretty tight ship. I was not the trial counsel. I was just involved in the appeal. My information as to what happened in the pre-trial conference is limited, but I do know that this case has come far along, and you're already in the second appeal. Now to introduce new evidence on a complaint that's several years old, there's something wrong with that. I'm not sure what it is, but it just seems too late. Under Rule 52, we can always remand a case back for further fact-finding. You could, but, Your Honor, you're saying that the grounding of that fact-finding is a complaint itself. My argument is that what's happened since the complaint was filed is superseded by a lot of events. Well, that's one of the reasons why you send something back for further fact-finding. On the mootness issue, perhaps. Well, even on the merits. Well, on the merits, then what would she have to do to get around the mootness issue, which is to go back and get admitted into the psych ward? You come back to the same thing, Your Honor. It's almost circular, but on this record, the only conclusion you can reach is that the case is moot. You're now claiming that the case is moot, and the burden's on you. The burden's on me, that's true, but all you have before you is that the NTC program was closed. They don't dispute that it's open. They're arguing that there's other units of the hospital that she might be admitted to and excluded, and that has never happened. As far as this case is concerned, this appeal, the case is moot. If she wants to try to get readmitted to a different unit in the hospital, she's welcome to and make her record and start from there. Just to be clear, her claim, as I understand it, is that this particular program has closed, but there are other similar services at the hospital, and that's what she wants. And what would you point us to to show that that's not correct? Sure, it has other services. Every hospital has different units and departments. My point is that she hasn't tried to get admitted to those other units. She hasn't shown what those other units' standards are for admission. That's not before the court. It's not in the pleadings or the way the case was tried. Her theory of the case was entirely based on NTC program, not any other unit. That's the theory of the case. When you're up on appeal, you're limited to your theory. So, in other words, if she'd gone to some other program, the hospital may well have let the dog in. It's possible. That's what I'm saying, because there's different personnel who may have had a different opinion about the use of the dog. We don't know that. It's not before the court. It's pure speculation to suggest that this case is not moved. It is moved. So, I guess on the clear error issue, I see counsel trying to re-litigate this case in front of this court. There was a three or four day trial in front of Judge Carter. I don't know what else you can do. I mean, to disagree with the evidence, we'll submit contrary evidence. You disagree with the experts, we'll introduce an expert. You think there's scientific evidence out there that would support your position, introduce the scientific evidence. And that never happened. So, you don't get a second bite at the apple on a factual issue. This is a quintessential factual issue. The question is, you know, is the fundamental- Well, ultimately, the question is, okay, so there are facts that are presented. The court makes findings of fact, just as Judge Carter did. Then the question is, based on those factual findings, have you established a violation of the statute? And that determination is de novo with us. Well, I don't think that that necessarily is. If it's a fundamental alteration and it depends on expert testimony and witness testimony, then that becomes factual. It's a mixed question of fact and law. Ultimately, there are legal consequences here, which gets us to de novo or clear air review. Well, if it's a mixed question, then you have to look to see if it's fundamentally legal or fundamentally factual. This is fundamentally factual and the mixed question- I don't know. I might disagree with you on that. I'm only one of three here, so. I think that's, and it's in our brief.  I'm sure the court sees this all the time. Sure. But I just think this is a very factual. Otherwise, you wouldn't have this much of a trial. You could have done it- Let me ask you this. How did the presence of, how would have the presence of Aspen fundamentally altered the service that you were providing to the plaintiff? Well, because the psychiatrist would say, look, I can't render the service adequately if you have your dog. I can't treat you adequately if you have the dog because I don't know if you're relying on the dog to address your coping or you're relying on the techniques we're trying to teach you. You know, I'm a professional. That's how Dr. Hirsch and felt about it. Just let me do my job and let me do it without interference. And it's like the cane or the phone calls to the family members. Well, how does the dog interfere? I'm trying to figure that out. Well, it may or may not, but you know what? You have to defer to professionals. Did the doctor say this is why the dog interferes? I mean, is there testimony? Is there evidence in the- I didn't read all the trial, what took place at the trial, but maybe I should. Well, the doctors testified, the defense doctors testified that the dog would interfere with her use of the coping techniques that they were trying to teach her. But even those witnesses talked about using various, I think there was something, somebody talked about holding an orange or like an ice cube or, I mean, so as sort of coping techniques that involved, it wasn't purely like purely an internal process. There was some scope for using external objects as part of the coping process. And it wasn't clear to me from their testimony why a dog would be different from those kinds of things. It may not be. I mean, that is- Well, but that seems like a problem for you, isn't it? Right? I mean, if they allow the other things but not allow the dog and there's no difference between them. I think the dog is focused, from her testimony, the dog is what she relies on primarily to deal with all of these anxieties, PTSD. The dog is the focus. It's not an inanimate object. It's not an orange. It's the dog. And so that is, and that's where the psychiatrist comes in. And again, you've got to have some deference to the professionals. And if you don't agree with that position, then you put on a professional who testifies to the contrary. This case is decided under the adversary system. Both sides put on evidence. And the judge makes a decision based on the evidence. That's why the clear error rule applies. And, you know, Judge Paez, I mean, you're suggesting you go back and read the entire record. Well, you shouldn't have to as an appellate court. You shouldn't have to go back and read the whole record. Well, I mean, that's, I mean, I'm, clear error is a deferential standard, but it's not so No, I'm not suggesting that at all. And so I guess just to return to the question, I mean, I think, and this is sort of a legal point, not just a factual point, that if, you know, if they allow, like, they have to explain why, you have to explain why it's, you know, if you're making some accommodations, but you won't make the accommodation for the person with the disability, in this case, the dog, you have to explain why they're different. And so what, again, is the difference between, you know, the other kinds of external aids that they apparently do allow in this one? Well, because the dog is her primary, her crutch. That's what she relies on to get through the day and get over PTSD and get over nightmares. Let's assume, for example, that she has a nightmare in the middle of the night. The dog would paw on her when she's having a nightmare. Okay, the professionals are telling her the way you deal with a nightmare is you ground yourself. You wake up, you ground yourself, and this is how you address it. But if you're relying on the dog to wake you up when you have a nightmare, then you're not using the techniques that they're teaching you in this program. That's one example. So you can't cover the gamut of it. Let me ask you this. Could they say, look, we're not even, we're not going to let you into this program under any circumstance, unless you get rid of Aspen? No, I don't think that's, they would have said that. I think she... Well, could they have? We're not going to treat you as long as you're relying on Aspen? Well, I don't think that came down that way, but that would be a hard and fast position. I think they looked at it, you know, as having a dog there. And, you know, it has to be, you require some individualized treatment. That occurred here, individualized assessment of the particular plaintiff's situation. But you can't get into such an individualized assessment that you have to look at what kind of dog it was, how well trained the dog is. These are psychiatrists. You can't require them all of a sudden to become dog specialists. That's asking too much of them. They opined based on their professional knowledge as doctors, as psychiatrists. And that is sufficient. And again, it's an adversarial system. If they think that they're wrong, introduce expert testimony of the contrary. And they did. And Judge Carter didn't accept it. And he issued detailed findings of fact. He tried to comply with a remand order as best he could. And I frankly think it's unfair to second guess a judge who's conducted a trial for three or four days. They're not always right. No, they're not always right. But we have to follow the rules in terms of deferral. There'd be no need for us to be here. No, there wouldn't. Right. But on some issues, the law says you have to defer to the trial judge. On a clear error, that's the key in this case. OK. Thank you very much. Ms. McGinnis, two minutes. On mootness, two points. Friends of the Earth versus lead law. Voluntary cessation is not sufficient unless we know the problem will not recur. If the hospital said, we no longer do this particular kind of physical therapy, neurodevelopmental physical therapy, so now you have to come back and get our new kind of physical therapy and re-injure and become injured again, they could evade review permanently. This case should be decided now. It is not moot. So, I mean, I think one way to put the struggle that we're all having here is, you know, we don't know if she calls up right now and says, hey, I'm having suicidal ideation, I need to check in. If they'd be like, we don't have a program for that anymore, then I think there might be a mootness problem, right? You know, and you just go somewhere else. But if they're like, yeah, come in, we're just not going to put you in this one name program or put you in another name program, then maybe not. But I just don't think we know, like, which one of those it is sitting here. So what can we do to figure that out? I think the court can look at the record upon remand. I mean, no new evidence was taken, but the evidence was that there was a psychiatric ward. Del Amo is a psychiatric hospital, but they're still here arguing this. They still have their psychiatric hospital and their locked psychiatric ward. I mean, it's sort of fundamental. They haven't come up and even represented to the court that they wouldn't accept her. They're just saying, we no longer have this one curriculum. And with respect, I don't think that really raises an Article III concern. What about the other issue? Maybe they have another curriculum, but it's different enough that the whole question of whether her dog could be included could maybe reach, they might give her a different answer. That's the second thing that, like, we just don't know that, do we? Well, I'm assuming from the fact that they're here defending themselves that they would still refuse the dog, which is really interesting. CL did not say, I was rejected from the NTC program. She said, I was refused access to their mental health services, their inpatient mental health services. It was Del Amo that was focusing on the specialness of its NTC program and how unique that was. And the court made findings, and so this is why it's not a clear error. The court made findings about the, what would happen, the impact upon CL because of this, because of the therapy that they were offering. But. Because of the NTC specific type of therapy? You know, it wasn't, the court's, the court's, the court's conclusions were about, a little bit about grounding. I direct the court's attention to 81 and 84. And then he just said, CL would not be as receptive to the therapy she was receiving. So it's, it's our position that the essential nature of this program is, is containment and stabilization to allow you to return to the community. And the court's findings did not say it would be futile. The court's rulings, the conclusions and findings did not say, I'm not going to be able to do my job. It said, I'll do my job and she won't receive the benefit, some amount of benefit. So that's why this is a de novo and mixed finding of fact review instead of a clear error decision. Thank you. Thank you very much. We thank all three counsels for their arguments in this case, and the case is submitted.
judges: PAEZ, MILLER, VANDYKE